## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| ADAM R.,[1] | ) | |
| | ) | |
| Plaintiff, | ) | No. 22 C 2567 |
| | ) | |
| v. | ) | Magistrate Judge Jeffrey Cole |
| | ) | |
| MARTIN J. O'MALLEY, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff applied for Supplemental Security Income under Title XVI of the Social Security
Act, 42 U.S.C. §§ 1381a, 1382c, almost three years ago in May 2020. (Administrative Record (R.)
297-302). He claimed that he had been disabled since January 11, 2020 (R. 297) due to a cyst on his
brain. (R. 374).[2] Over the next two years, plaintiff's application was denied at every level of
administrative review: initial, reconsideration, administrative law judge (ALJ), and appeals council.
It is the most recent ALJ's decision that is before the court for review. *See* 20 C.F.R. §§ 404.955;
404.981. Plaintiff filed suit under 42 U.S.C. § 405(g) on May 16, 2022, and the case was fully
briefed as of December 28, 2022. [Dkt. ##12-15].  After a year, the parties consented to the
jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636(c) on January 4, 2024. [Dkt. #22].

---

[1] Northern District of Illinois Internal Operating Procedure 22 prohibits listing the full name of the
Social Security applicant in an Opinion. Therefore, the plaintiff shall be listed using only their first name and
the first initial of their last name.

[2] That was the plaintiff's third application in five years.  He applied for benefits on May 11, 2015,
claiming he became disabled on March 31, 2015.  That application was denied by ALJ on September 28,
2017 (R. 132-141).  A couple of months later, he reapplied, this time claiming a disability onset date of
September 26, 2017.  That application was denied by an ALJ on January 15, 2020. (R. 150-164).

Plaintiff asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision.

## I.

After an administrative hearing at which plaintiff, represented by counsel, testified, along with a vocational expert, the ALJ determined the plaintiff had the following severe impairment: seizure disorder. (R. 17). Focusing on Listing 11.02, the ALJ found that plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 17-18).

The ALJ then determined that the plaintiff had the residual functional capacity ("RFC") to capacity to perform work at all exertional levels except "no climbing of ladders, ropes or scaffolds; no work around unprotected heights, open flames, or unprotected dangerous moving machinery; no driving a commercial motor vehicle; no concentrated exposure to dusts, fumes, gases, or poor ventilation; occasional climbing ramps and stairs." (R. 18). The ALJ then summarized the plaintiff's allegations, noting that the plaintiff described his seizures as unpredictable, disorienting, and resulting in injuries to himself or others. He had them at least once a week. The plaintiff explained that he had migraines from a cyst on his brain that ruptured. The plaintiff said that he did not drive based upon the orders from his physician in 2016. He said his seizures have resulted in injuries with multiple instances of treatment for broken ribs or teeth. The seizures usually lasted approximately three minutes, but occasionally longer; he would go to the hospital if they lasted last five to seven minutes. The plaintiff also said 80% of his seizures result in loss of bowel or bladder control or both. He explained that after a seizure he was "out of it" for hours and hours, and at times for up to a day.

2

(R. 19).

The ALJ then found that the plaintiff's "medically determinable impairment could reasonably be expected to cause the alleged symptoms; however, [his] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (R. 19). The ALJ then reviewed the medical evidence. She noted that, in May 2019, the plaintiff reported that he had a few seizures each week, and was taking Keppra, Rantindine HCl, Tramadol, ProAir HFA, and Fycompa. His treating physician certified him for medical marijuana. In August 2019, the plaintiff reported the frequency of his seizures was the same. In September 2019, the plaintiff sought treatment for right foot pain. Later, in March, the plaintiff's physical showed unremarkable gait and normal neurological and musculoskeletal findings. (R. 19). The ALJ noted that, in May 2020, the plaintiff reported that he had had four seizures in the past two weeks and had injured his right shoulder and right foot due to a fall. On June 2, 2020, an x-ray of the claimant's right shoulder showed no evidence for acute abnormality, and an x-ray of the right foot also failed to show any abnormalities. (R. 20).

The ALJ went on to note that on June 9, 2020, the plaintiff was brought to the emergency room by his parents, reporting he had had a seizure the prior night and had fallen, striking his head and lip on a table. At the time of examination plaintiff was awake, alert, and oriented. Bloodwork showed an alcohol level of 0.55. The plaintiff reported drinking beer every four or five days, but that was not consistent with his blood alcohol levels. Examination showed neurologically intact findings. While the plaintiff denied any noncompliance with medications, it was noted that his drinking belied that, and that he had not seen his neurologist since in September 2019. Additionally, his Keppra was

3

at subtherapeutic levels, also suggesting he was not taking the medication as prescribed. (R. 20). The doctor noted that plaintiff had a dermoid cyst that had ruptured in 2002 with earlier imaging studies showing no significant changes. An x-ray of the claimant's cervical spine in June 2020 showed no acute findings or degenerative changes, but a CT scan showed findings "concerning for a ruptured intracranial dermoid cyst," but no midline shift or intracranial hemorrhage. A CT scan of the chest showed nondisplaced fractures of the left lateral nine and tenth ribs. The plaintiff was discharged with a diagnosis of breakthrough seizures, most likely due to alcohol abuse and noncompliance, suspected alcohol abuse, rib fractures, and an intracranial dermoid cysts, similar to configuration to imaging 18 years earlier in 2002. (R. 20).

Continuing with the review, the ALJ related that treatment notes in 2021 showed that the claimant's chronic foot pain continued. In May 2021, he sought treatment for right foot pain. Examination showed decreased range of motion and positive hammertoe in the right foot and ankle. The plaintiff was diagnosed with neuralgia and neuritis as well as osteonecrosis due to a previous trauma to the right foot. The ALJ noted that imaging studies showed no remarkable findings, and no evidence of "osteonecrosis," contrary to the podiatrist's diagnosis. The plaintiff elected conservative management with a CAM boot. (R. 20).

On June 26, 2021, the plaintiff was back in the emergency room, complaining of having had a seizure two days earlier and suffering a fall. The plaintiff reported that he continued to smoke cigarettes at the rate of ½ pack a day and to drink socially every week. Imaging of the chest and an electrocardiogram were both unremarkable. Examination showed no bruising to the ribs, and the plaintiff was discharged with medication. (R. 21).

From there, the ALJ went on to consider the medical opinions. The ALJ noted that the state agency medical reviewers found that the plaintiff had no exertional limitations, but could only occasionally climb ramps and stairs; never climb ladders, ropes or scaffolds; and should avoid even moderate exposure to hazards, including machinery and heights. The ALJ felt the opinions of the state agency consultants were persuasive because they were acceptable medical sources, and their opinions were consistent with the record, which showed some regularity of complaints regarding seizure activity with injuries, but little corroboration in terms of witnessed events by medical staff. When plaintiff sought treatment for a seizure on June 9, 2020, it was noted that he was noncompliant with treatment and had high levels of alcohol in his blood, a non-therapeutic level of Keppra, and that he failed to follow-up with his neurologist for a period of about nine months as directed. Further, his dermoid cyst was unchanged from 2002 when it had originally ruptured. The ALJ noted that the plaintiff continued to drink alcohol and smoke throughout the relevant period.

Then the ALJ noted that Dr. Kahn wrote on November 9, 2020, that it was in the best interest of the plaintiff not to perform any work duties at that present time and completed a residual functional capacity opinion form in which he stated that the plaintiff had three seizures within the month prior to his letter. The doctor thought that the plaintiff would need to lie down during seizures with a period of approximately half an hour necessary after a seizure. The doctor also felt that the plaintiff could not work at heights, or around power machines, drive motor vehicles, or ride busses alone. He stated that the plaintiff did not suffer from ethanol-related seizures, and that he could not work because he did not know when he was going to have a seizure. The ALJ found Dr. Kahn's opinions not persuasive. The ALJ noted the doctor was a treating physician but not a neurologist. The ALJ pointed out that Dr. Kahn's opinions were not consistent with or supported by his own

exams or the other objective evidence. The ALJ explained that the plaintiff reported varying frequency of seizures, but there was no documented EEG evidence, and no medical personnel had ever witnessed a seizure. The neurological exams by plaintiff's neurologist and by Dr. Khan, showed no neurological loss despite the allegations of multiple seizures per week, some lasting more than five minutes. The ALJ also noted that while Dr. Khan indicated that the plaintiff did not have seizures related to alcohol use and that the plaintiff was compliant with medication, the evidence showed both alcohol use and non-compliance with medication and with medical follow up. (R. 22).

The ALJ then considered the testimony of the vocational expert and determined that the plaintiff retained the capacity to perform his past relevant work as a drawbridge operator as actually and generally performed. (R. 23). The ALJ further found, relying on the vocational expert's testimony, that the plaintiff could also perform other jobs that existed in significant numbers in the national economy, including both light level jobs – Casher II (DOT # 211.462-01; 571,000 jobs in the nation); Marker (DOT #209.587-034; 125,000 jobs); Routing Clerk (DOT #222.687-022; 97,000 jobs) – and sedentary level jobs – Document preparer (DOT #249.587-018; 26,000 jobs); Assembler (DOT #739.684-094; 23,000 jobs); Charge Account Clerk (DOT #205.367-014; 2,000 jobs). (R. 24). Accordingly, the ALJ concluded that the plaintiff was not disabled and not entitled to benefits under the Act. (R. 25).

## II.

The court's review of the ALJ's decision is "extremely limited." *Jarnutowski v. Kijakazi*, 48 F.4th 769, 773 (7th Cir. 2022). If the ALJ's decision is supported by "substantial evidence," the court on judicial review must uphold that decision even if the court might have decided the case differently in the first instance. See 42 U.S.C. § 405(g). The "substantial evidence" standard is not

a high hurdle to negotiate. *Biestek v. Berryhill*, – U.S. –, –, 139 S. Ct. 1148, 1154 (2019); *Baptist v. Kijakazi*, 74 F.4th 437, 441 (7th Cir. 2023); *Bakke v. Kijakazi*, 62 F.4th 1061, 1066 (7th Cir. 2023). Indeed, it may be less than a preponderance of the evidence, *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007); *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007), and is only that much "evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Baptist v. Kijakazi*, 74 F.4th at 441. To determine whether "substantial evidence" exists, the court reviews the record as a whole, but does not attempt to substitute its judgment for the ALJ's by reweighing the evidence, resolving debatable evidentiary conflicts, or determining credibility. *Crowell v. Kijakazi*, 72 F.4th 810, 814 (7th Cir. 2023); *Reynolds v. Kijakazi*, 25 F.4th 470, 473 (7th Cir. 2022); *Gedatus v. Saul*, 994 F.3d 893, 900 (7th Cir. 2021). Where reasonable minds could differ on the weight of evidence, the court defers to the ALJ. *Karr v. Saul*, 989 F.3d 508, 513 (7th Cir. 2021); *Zoch v. Saul*, 981 F.3d 597, 602 (7th Cir. 2020); *see also Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966)(". . . the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence."); *Blakley v. Comm'r Of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009)("The substantial-evidence standard ... presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.").

But, in the Seventh Circuit, the ALJ also has an obligation to build what is called an "accurate and logical bridge" between the evidence and the result to afford the plaintiff meaningful judicial review of the administrative findings. *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015); *O'Connor–Spinner v. Astrue*, 627 F.3d 614, 618 (7th Cir.2010). The court has to be able to trace the path of the ALJ's reasoning from evidence to conclusion. *Minnick v. Colvin*, 775 F.3d 929, 938 (7th

Cir. 2015); *Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011). The Seventh Circuit has explained that, even if the court agrees with the ultimate result, the case must be remanded if the ALJ fails in his or her obligation to build that "logical bridge." *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)(". . . we cannot uphold a decision by an administrative agency, any more than we can uphold a decision by a district court, if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."); *see also Jarnutowski*, 48 F.4th at 774 (". . . the Commissioner argues, we should affirm the ALJ's decision because it was supported by the evidence. Possibly. But we cannot reach that conclusion from the ALJ's analysis."); *but see, e.g., Riley v. City of Kokomo*, 909 F.3d 182, 188 (7th Cir. 2018)("But we need not address either of those issues here because, even if [plaintiff] were correct on both counts, we may affirm on any basis appearing in the record,...."); *Steimel v. Wernert*, 823 F.3d 902, 917 (7th Cir. 2016)("We have serious reservations about this decision, which strikes us as too sweeping. Nonetheless, we may affirm on any basis that fairly appears in the record."); *Kidwell v. Eisenhauer*, 679 F.3d 957, 965 (7th Cir. 2012)("[District court] did not properly allocate the burden of proof on the causation element between the parties,...No matter, because we may affirm on any basis that appears in the record.").

Of course, this is a subjective standard, and a lack of predictability comes with it for ALJs hoping to write opinions that stand up to judicial review. One reviewer might see an expanse of deep water that can only be traversed by an engineering marvel like the Mackinac Bridge. Another might see a trickle of a creek they can hop across with barely a splash. But, the Seventh Circuit has also called this requirement "lax." *Crowell*, 72 F.4th at 816; *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008); *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008). All ALJs really need to do is "minimally

articulate" their reasoning. *Grotts v. Kijakazi*, 27 F.4th 1273, 1276 (7th Cir. 2022); *Brown v. Colvin*, 845 F.3d 247, 252 (7th Cir. 2016). "If a sketchy opinion assures us that the ALJ considered the important evidence, and the opinion enables us to trace the path of the ALJ's reasoning, the ALJ has done enough." *Stephens v. Heckler*, 766 F.2d 284, 287-88 (7th Cir. 1985).[3] The ALJ did enough here.

Finally, the Seventh Circuit recently explained that "the 'logical bridge' language in our caselaw is descriptive but does not alter the applicable substantial-evidence standard." *Brumbaugh v. Saul*, 850 F. App'x 973, 977 (7th Cir. 2021).

---

[3] Prior to *Sarchet*'s "logical bridge" language, the court generally employed the phrase "minimal articulation" in describing an ALJ's responsibility to address evidence. *Zalewski v. Heckler*, 760 F.2d 160, 166 (7th Cir. 1985)(collecting cases). The court's focus was on whether an ALJ's opinion assured the reviewing court that he or she had considered all significant evidence of disability. In *Zblewski v. Schweiker*, 732 F.2d 75 (7th Cir. 1984), for example, the court "emphasize[d] that [it] d[id] not require a written evaluation of every piece of testimony and evidence submitted" but only "a minimal level of articulation of the ALJ's assessment of the evidence...in cases in which considerable evidence is presented to counter the agency's position." *Zblewski*, 732 F.2d at 79. In *Stephens v. Heckler*, 766 F.2d 284, 287-88 (7th Cir. 1985), the court rejected a plaintiff's argument that an ALJ failed to adequately discuss his complaints of pain and was more explicit about how far ALJs had to go to explain their conclusions:

> We do not have the fetish about findings that [the plaintff] attributes to us. The court review judgments, not opinions. The statute requires us to review the quality of the evidence, which must be "substantial," not the quality of the ALJ's literary skills. The ALJs work under great burdens. Their supervisors urge them to work quickly. When they slow down to write better opinions, that holds up the queue and prevents deserving people from receiving benefits. When they process cases quickly, they necessarily take less time on opinions. When a court remands a case with an order to write a better opinion, it clogs the queue in two ways—first because the new hearing on remand takes time, second because it sends the signal that ALJs should write more in each case (and thus hear fewer cases).
>
> The ALJ's opinion is important not in its own right but because it tells us whether the ALJ has considered all the evidence, as the statute requires him to do....This court insists that the finder of fact explain why he rejects uncontradicted evidence. One inference from a silent opinion is that the ALJ did not reject the evidence but simply forgot it or thought it irrelevant. That is the reason the ALJ must mention and discuss, however briefly, uncontradicted evidence that supports the claim for benefits.

*Stephens*, 766 F.2d at 287 (citations omitted).

### III.

The plaintiff has three arguments against the ALJ's decision in this case. First, the plaintiff contends that the ALJ's evaluation of the medical opinion evidence was not supported by "substantial evidence." Second, the plaintiff argues The ALJ's residual functional capacity (RFC) assessment was not supported by "substantial evidence" because she failed to explain how the evidence led to her conclusions. Finally, the plaintiff complains that the ALJ's evaluation of his allegations was not supported by "substantial evidence." We begin with the plaintiff's last argument because the plaintiff has set up a row of dominoes that depend on whether the ALJ adequately assessed his credibility.

### A.

The plaintiff takes issue with the ALJ's comparison of his allegations to the medical record. [Dkt. #12, at 13-15]. In that regard, the ALJ noted that "during the only instances of seizure activity with noted postictal findings, the [plaintiff] had a high level of alcohol in his system, was noncompliant with follow-up visits, and had a subtherapeutic level of medication on board." (R. 22). These conclusions were, according to the evidence, true, and plaintiff does nothing to call the ALJ's observations into question.

First, as the ALJ noted, the record includes scant evidence of treatment for seizure episodes. Plaintiff sought treatment for a seizure on just one occasion, on June 20, 2020 (R. 445), over the course of four years. On a couple of other occasions, the plaintiff sought treatment for injuries due to falls he said he had suffered during a seizure. That does tend to call into question plaintiff's claim that he had at least one seizure a week. At the very least, it tends to show that his seizures were, with one rare exception, managed at home. The ALJ wasn't necessarily saying that the absence of

10

treatment during a postictal state meant the plaintiff was lying; she was saying it sounds like the plaintiff was exaggerating.

Second, and more importantly, on that one occasion, plaintiff's seizure was determined to be the result of alcohol abuse and noncompliance with treatment. (R. 445-48). The plaintiff completely ignores that point and argues that there is no evidence that seeing his neurologist would have reduced or eliminated his seizures. [Dkt. #12, at 14]. Failing to see his neurologist was but one example of plaintiff's noncompliance with treatment. As the ALJ noted, the doctors who treated the plaintiff said his seizure was due to alcohol abuse – plaintiff's level was well above legal intoxication at .55 – and plaintiff's failure to take his medication as direction. The ALJ would have been noncompliant with her duties had she failed to take into consideration that the only time the plaintiff needed treatment for a seizure was when he had too much to drink and didn't take his seizure medication. Obviously, given the record and the ALJ's discussion of it, it cannot be said that the ALJ's evaluation of plaintiff's allegations was "patently wrong", and so it must stand. *Hess v. O'Malley*, – F.4th –, –, 2024 WL 470523, at *6 (7th Cir. Feb. 7, 2024)("We will overturn the ALJ's evaluation of a claimant's subjective symptoms only if it is "patently wrong, which means that the decision lacks any explanation or support."); *Tutwiler v. Kijakazi*, 87 F.4th 853, 859 (7th Cir. 2023); *Grotts*, 27 F.4th at 1279("As long as an ALJ gives specific reasons supported by the record, we will not overturn a credibility determination unless it is patently wrong.").

That being said, it's a bit of a surprise that plaintiff takes a run at the ALJ's credibility determination in this case. At his administrative hearing, the plaintiff claimed he had not had a drink since 2019. (R.52). When confronted with the hospital record and the .55 ETOH level finding, he first fecklessly claimed it was wrong, then said he retracted his claim he hadn't been drinking:

ALJ: Okay, I guess I have to follow up on that. You're saying the last time you drank anything was longer ago than July 2019 – or August of 2019?

Plaintiff: Yes, your honor.

ALJ: Okay, so can you explain how when you were hospitalized in June of last year, last summer just a little over a year ago, you had a blood alcohol level of .55?

Plaintiff: Your honor, I'm going to be honest with you, I did not drink at all when I was hospitalized.

ALJ: Well, okay you didn't drink during the hospitalization, but in the emergency room, your – they took your blood. Your BAC was .55 and you admitted to drinking 2 beers every 4 to 5 days.

Plaintiff: Your honor. I admitted to drinking. You know what, I retract my previous statement then. That day I did have a couple of beers, but I mean, other than that, no, I don't drink.

(R. 53). Like the attending physician at the hospital, the ALJ understandably was a bit incredulous that two beers got the plaintiff's blood alcohol level up to .55. (R. 53). And, she was curious as to why the plaintiff told the doctor he drank two beers every four or five days but told her he never drank, or at least, only drank that one day he went to the hospital:

ALJ: Okay, so you got a blood alcohol level of .55 from 2 beers?

Plaintiff: I – I'm not sure what it was but –

ALJ: Okay, and where it shows here that you said that you admitted to drinking 2 beers every 4 or 5 days, is that accurate at all?

Plaintiff: No, I never said that.

(R. 53). So, in order to find the plaintiff credible, the ALJ would have had to find that the blood alcohol test was wrong, and the attending physician and staff were lying about what the plaintiff told them. That's a lot to ask.

12

The plaintiff was also an unreliable witness about his smoking at his hearing, saying he had quit a year and a half earlier in February 2020, (R. 55-56), even though at the hospital in June 2020, he conceded he was smoking a pack of cigarettes a day. (R. 445). At another appointment in July 22, 2021, he told the doctor he smoked every day. (R. 584). He also told the ALJ he didn't date because he didn't want a girlfriend to see him have a seizure. (R. 56-57). But that line unraveled when the ALJ pointed out that he asked his treating physician for an STD test in March 2020 because his girlfriend had tested positive. (R. 57, 425):

> ALJ: Okay, and what about dating? Do you do any dating at all?
>
> Plaintiff: No.
>
> ALJ: Do go – I mean do you try to, I don't know, online date or have friends set you up with anyone, anything like that?
>
> Plaintiff: No. I – no. I just get too worried that something would happen and I don't want anyone else to see me like this.
>
> ALJ: Okay. I'm just asking  – just wondering because I did see that in March of last year, you were seeking to be tested for a sexually transmitted disease.
>
> Plaintiff: Excuse me?
>
> ALJ: Just saying what it says in the medical record.
>
> Plaintiff: That I was what?
>
> ALJ: Let me find the exact page. Patient stating, he had sexual intercourse and the girl tested positive for gonorrhea, he would like to be tested. That was Dr. K[h]an, March 5 of 2020.
>
> Plaintiff: I – well, that's impossible.
>
> ALJ: Okay. All right, so that's another thing that's in the medical record that's not correct then. I understand.

(R. 57). Dr. Khan not only logged plaintiff's concerns in his treatment notes, but prescribed

13

Doxocycline Monohydrate for him. (R. 425-26). So, if it was impossible, as the plaintiff told the ALJ, does that mean Dr. Khan was lying? Again, the ALJ would have had to think so, in order to find plaintiff credible. And that, the evidence would not allow him to do.

Then there is the frequency of the plaintiff's seizures. In front of a different ALJ at a previous hearing on November 20, 2019, the plaintiff claimed his doctor told him the staff at the emergency room called him a "frequent flyer" because of his many visits for seizure treatment. (R. 83). But, as the ALJ pointed out back then, there just isn't any evidence of multiple emergency room visits to back that up.

ALJs aren't supposed to assess a plaintiff's character, but they are still free to assess the credibility of a plaintiff's assertions. *Cole v. Colvin*, 831 F.3d 411, 412 (7th Cir. 2016). Truthfulness may be a facet of one's character, but to say a plaintiff has not been truthful about his impairments is not to deny their application based on character. If one has a seizure disorder, doctors tell them not to drink alcohol and advise them to take their medication as directed. The plaintiff has not been truthful about that here, and the ALJ properly pointed it out. When a plaintiff's testimony is demonstrably faulty, arguing that the ALJ's credibility determination was "patently wrong" is perhaps not the best battle to pick.

**B.**

But, the plaintiff has picked a couple of other battles. One is the reasoning the ALJ provided for rejecting the opinion from his treating physician, Dr. Khan. On November 9, 2020, Dr. Khan wrote that plaintiff had "been diagnosed with recurring seizures" and that "[i]t [wa]s in the best interest of [plaintiff] NOT to perform any work duties at the present time." (R. 507). The doctor also filled out a form provided by the plaintiff's attorney. He checked "yes" when asked if plaintiff had

14

seizures, but was unable to say what type or whether they were generalized or localized. Dr. Kahn did know that plaintiff had three seizures a week, each lasting a "few minutes." He also knew that the plaintiff did not always have warning he was going to have a seizure. Precipitating factors were "a lot of physical activity & stress." For postictal manifestations, Dr. Khan checked "confusion, muscle strain, severe headache, irritability, exhaustion." Dr. Khan wrote that these manifestation lasted "20 to 25 minutes." (R. 508). Dr. Khan added that plaintiff was not able to be alone or work.

He checked "yes" when asked if plaintiff had a history of injury after a seizure, and "yes" when asked if he had a history of urinary or fecal incontinence. He wrote that plaintiff experienced drowsiness as a side effect of medication and checked "yes" when asked if plaintiff was compliant in taking medication.

When asked about plaintiff's medication levels, the doctor wrote that the plaintiff's "range of levels accurate & no medication changes." Dr. Khan checked "no" when asked if plaintiff's seizures were alcohol-related. The doctor then checked off boxes to indicate that plaintiff's seizures were likely to disrupt co-workers (in the past), and that he couldn't work at heights, with power machines, operate a motor vehicle, or take a bus alone. When asked whether plaintiff would need unscheduled work breaks or could tolerate work stress, Dr. Khan wrote "not working." (R. 509). He checked "more than four days a month" when asked how often the plaintiff would be absent from work. Finally, when asked what other limitation the plaintiff would need at work, the doctor wrote "not able to work since he does not know when he is going to have a seizure." (R. 510).

For claims filed after March 20, 2017, like the plaintiff's:

the opinions of treating physicians no longer receive controlling weight. See 20 C.F.R. § 416.920c. Instead, the "most important factors" are a medical opinion's "supportability" and "consistency" with the evidence in the record. *Id.* § 416.920c(a).

> Under these new regulations, a doctor's "relationship with the claimant" only "may help" in assessing an opinion's persuasiveness. Id. § 416.920c(c)(3)(i)–(v). And an ALJ "may, but [is] not required to, explain how [she] considered" these factors in explaining her ultimate reliance on a medical opinion. Id. § 416.920c(b)(2).

*Albert v. Kijakazi*, 34 F.4th 611, 614 (7th Cir. 2022); *see also Prill v. Kijakazi*, 23 F.4th 738, 750–51 (7th Cir. 2022). Here, the ALJ found Dr. Khan's opinions "not persuasive" because: (1) he is an internal medicine specialist, not a neurologist; (2) his opinions were neither consistent with nor supported by his own exams; and (3) his opinions were not consistent with the other objective evidence. The first reason is a bit shaky. While physician specialty is one of the things ALJs can consider when weighing a medical opinion, *Crowell*, 72 F.4th at 816; *Elder*, 529 F.3d at 415, it makes little sense to deduct points from Dr. Kahn for lack of specialty while making no mention of specialty with regard to the state agency reviewers, who were a pathologist 12 (Dr. Jhaveri) and a general practitioner 31 (Dr. Aquino). (R. 179, 194); https://secure.ssa.gov/poms.nsf/lnx/0424501004. But the ALJ's other two reasons were valid, and she minimally articulated her reasoning regarding them – at the very least. *Crowell*, 72 F.4th at 816; *Grotts*, 27 F.4th at 1278.

First, as the ALJ found, Dr. Khan's treatment notes do not support his November 9, 2020 opinion. The doctor's notes are at best, cursory. Sometimes he noted that plaintiff had seizures since his last visit (R. 422, 425-27, 442-44, 555-57) and sometimes he didn't. (R. 431-34, 439,436-37, 519-21, 573-74, 584). One can only assume that Dr. Khan got his rather specific descriptions of plaintiff's seizures and their effects – three a week, lasting a few minutes, postictal manifestations lasting 20 to 25 minutes, etc. – from the plaintiff. The doctor never witnessed a seizure in the office and certainly didn't follow the plaintiff around outside the office. That's usually the case when a seizure disorder is involved. But, even when plaintiff did mention a seizure at an office visit, Dr.

Khan never made note of any description of the seizure or length or effects. Dr. Khan's neurological exams never revealed any abnormalities. In short, Dr. Khan's opinion has little to do with his treatment notes and appears to have been based solely on plaintiff's subjective complaints. But "where a treating physician's opinion is based on the claimant's subjective complaints, the ALJ may discount it." *Baptist*, 74 F.4th at 444; *Prill v. Kijakazi*, 23 F.4th 738, 751 (7th Cir. 2022)(". . . when a physician's opinion is based primarily upon a patient's subjective complaints, the ALJ may discount that opinion.').

Given plaintiff's lack of credibility discussed above, it has to be said that the plaintiff's allegations aren't a solid basis for a medical opinion. The disconnect between Dr. Khan's opinion and his treatment notes is startling: on one hand Dr. Khan says *activity* is a precipitating factor for plaintiff's seizures in his opinion, but recommends *exercise* in his treatment notes. (R. 442-44). The ALJ certainly wasn't wrong in finding that Dr. Khan's opinion wasn't supported by his own treatment notes. *See, e.g., Pavlicek v. Saul*, 994 F.3d 777, 783 (7th Cir. 2021)(contrast between doctor's opinion and doctor's treatment notes supported ALJ's rejection of doctor's opinion)

Similarly, and as the ALJ said, the doctor's opinion is out of alignment with the other medical evidence. Perhaps the most significant disparity is the fact that Dr. Khan claims plaintiff's seizures are not related to alcohol abuse and reports that he is complaint with medication. Both points are, of course, belied by the only hospital records pertinent to treatment of a recent seizure, in which plaintiff's blood alcohol level was well above legal intoxication at .55, and his Keppra levels were non-therapeutic. The attending physician diagnosed seizure due to alcohol abuse and non-compliance with medication. (R. 445-48). So, the ALJ's assessment of Dr. Khan's opinion was accurate on both counts.

### C.

The plaintiff's final issue with the ALJ's decision is the ALJ's residual functional capacity assessment. The plaintiff argues that it was not supported by "substantial evidence" and that the ALJ failed to explain how the evidence led to her conclusions. [Dkt. #12, at 9-13]. But the ALJ considered all the evidence, including the only seizure treatment records, which indicated that plaintiff's seizure was due to alcohol abuse and noncompliance with medication. (R. 22). The ALJ then explained that she was accommodating the plaintiff's seizure disorder with limitations in activities which would harm the claimant should he experience a seizure, such as limitations on heights and hazards as specified, driving a commercial vehicle, and climbing. (R. 22). ALJs only need only account for those limitations supported by the medical evidence. *Vang v. Saul*, 805 F. App'x 398, 402 (7th Cir. 2020); *Jozefyk v. Berryhill*, 923 F.3d 492, 497–98 (7th Cir. 2019); *Simila v. Astrue*, 573 F.3d 503, 521 (7th Cir. 2009). That is precisely what the ALJ did here.

The plaintiff contends that the ALJ ought to have included limitations for off-task time and disruption of co-workers, citing Dr. Khan's November 9, 2020 opinion. [Dkt. #12, at 11-12]. But, as just discussed, the ALJ properly found Dr. Khan's opinion unpersuasive, because it was not supported by his treatment notes, and because it was not consistent with other medical evidence. Given the medical evidence, Dr. Khan's opinion simply echoed the plaintiff's allegations, so the ALJ wasn't wrong to disregard it. *Baptist*, 74 F.4th at 444; *Karr*, 989 F.3d at 512; *Bates v. Colvin*, 736 F.3d 1093, 1100 (7th Cir. 2013). That is especially the case here because, again, the plaintiff's allegations, one after another, were not credible.

18

**D.**

As noted at the outset, and as the Commissioner points out in his rather succinct and persuasive brief, the plaintiff's claim is not unlike a row of dominoes, with one knocking over the next. Somewhat like allegations of pain, allegations of seizures – in terms of severity and frequency – are not always provable. It's unlikely a medical professional will witness one. So, if one is going to claim disability based on seizures, the credibility of a claimant's allegations is vitally important. But, the plaintiff in this case took a different route. He exaggerated the frequency of his seizures, testifying that "Dr. Kahn also said, though, that at this point – because they were calling me a frequent flyer because I was constantly going to the emergency room." (R. 83). But he went to the emergency room only once for a seizure and on just one other occasion for an injury he claimed a due to a seizure. He didn't tell the emergency room physicians or Dr. Khan the truth about his drinking. He didn't tell the truth about it to three different ALJs as well. (R. 52-53, 75, 109). He told the ALJ his seizures were such that he did not date because he wouldn't want a girlfriend to see him like that. (R. 56-57). But he told Dr. Khan his girlfriend tested positive for an STD, and that he wanted a test; Dr. Khan prescribed Doxocycline Monohydrate for him. (R. 425-27). As the plaintiff's allegations go, so goes his treating physician's medical opinion based on those allegations.

In the end, this case is a good one in which to recall what the Seventh Circuit said in another case in which the plaintiff there alleged disability as a result of seizures – as well as a host of other issues. "The ALJ's determination effectively requires [plaintiff] to try to get a job and give work a shot. If working proves beyond [plaintiff's] capacity, []he can apply again for Social Security benefits. And nothing we have said in our opinion should be read to prohibit a finding of disability in the future." *Albert*, 34 F.4th at 617.

19

## CONCLUSION

For the foregoing reasons, the defendant's motion for summary judgment [Dkt. #13] is granted, and the ALJ's decision is affirmed.

ENTERED:_____

**UNITED STATES MAGISTRATE JUDGE**

**DATE:** 3/5/24

20